# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KRISTI SWANSON,

                Plaintiff,

      v.

VILLAGE OF FREDERIC, WILLIAM F.
JOHNSON, JOHN R. BOYER, MARIA
M. AMMEND, JAMIE J. WORTHINGTON,
BRAD J. HARLANDER, TERRY J.
SIEBENTHAL, JAMES MEYER, GEORGE
HANSFORD and DOUG GUSTAFSON,

                Defendants.

**OPINION AND ORDER**

17-cv-477-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Kristi Swanson is proceeding on a First Amendment claim against defendant Village of Frederic and several current and former members of the village board. Plaintiff contends that she was terminated from her position as clerk and deputy treasurer of the village in retaliation for her reporting the misconduct of another village employee. Defendants have filed a motion for summary judgment, contending that plaintiff's retaliation claim fails because her speech was not protected by the First Amendment and, even if it was protected, plaintiff was terminated because the village board lacked confidence in her ability to continue as clerk and deputy treasurer, not because of any protected speech.

I conclude that plaintiff's speech to the Polk County Sheriff's office regarding alleged misconduct in the village office is protected by the First Amendment. Additionally, I conclude that there are genuine disputes of material fact regarding whether defendants Maria

1

Ammend, Terry Siebenthal, Douglas Gustafson, George Hansford, Brad Harlander and James Meyer terminated plaintiff because of her protected speech. Therefore, I will deny defendants' motion for summary judgment with respect to those defendants. However, I will grant defendants' motion with respect to defendants William Johnson, Jamie Worthington and Jim Boyer because the undisputed evidence shows that these defendants were not involved in the decision to terminate plaintiff. Finally, I will grant defendants' motion for leave to file supplemental proposed findings of fact. Dkt. #65.

From the parties' proposed findings of facts and responses, I find the following facts to be material and undisputed unless otherwise noted.

## UNDISPUTED FACTS

### A. The Parties

Defendant Village of Frederic has a population of just over 1,000 people. Plaintiff Kristi Swanson was hired for the positions of treasurer and deputy clerk of the village in February 2004. She worked for the village until she was terminated in November 2015.

The Village of Frederic Board is composed of seven elected individuals, with one board member serving as president. Defendants William Johnson, Maria Ammend, Jamie Worthington, Terry Siebenthal, Douglas Gustafson, George Hansford, Brad Harlander, Jim Boyer and James Meyer served on the board at various times.

## B.  Village Office Staff from 2005 to 2013

Starting in 2005, the village office was staffed by three people:  plaintiff was the treasurer and deputy clerk; Dave Wondra was the  administrator; and Marilyn Sederlund was the clerk/deputy treasurer.   When plaintiff was hired, she received a written job description that stated she was to perform the duties of "treasurer," under Wis. Stat.  § 61.25, and assist the clerk as "deputy clerk," under § 61.26.  Dkt. #43-1.  She was to "insure compliance with all local state and federal laws," "perform a variety of routine and complex clerical and administrative tasks," and "conduct adequate research and present such findings, in a professional manner, to the Village Board."  Id.  The written job description stated that plaintiff's essential duties and responsibilities were:

1.  Receives all monies belonging to or owed to the village from any source directed by law to be paid to the village.  Deposit upon receipt collected funds in the name of the village at the public depository(s) as directed by the village board.

2.  Keep accurate detailed accounts of all transactions showing, amount and sources of revenue, numbered receipts and date received, any disbursements check number and date.

3.  Reconcile all checking accounts.

4.  Provide monthly reports of expenses to budget and a check register.

5.  Prepare annual village budget, library budget, water and sewer budget.

6.   Prepare biweekly payroll.  Prepare and submit monthly, quarterly and annual reports as required by state and federal law.

7.  Execute water and sewer utility billing and collections. Keep accurate, up to date customer records;

8.  Prepare statements of taxes and transmit to the county clerks.

9.  Present all invoices to the appropriate supervisor for approval of payment.  Code all invoices for payment.  Prepare checks for signature and mailing.

10.  Assist, as directed, with annual audit.

11.  Courteously greet visitors or callers, answer their questions promptly or direct them to the appropriate person or department for a response.

12.  Perform all other duties required by law, village ordinance or as directed by the village board.

Id.  Plaintiff's actual day-to-day responsibilities as treasurer/deputy clerk were similar to her written position description.

After Marilyn Sederlund died in 2010, plaintiff's position changed from treasurer and deputy clerk to clerk and deputy treasurer, and she took on village clerk duties, including typing and posting meeting agendas, recording meeting minutes, attending meetings, working with committees on such things as ordinances and resolutions and posting election notifications.  Although her title changed, plaintiff did not receive a new written job description.  Around the same time, Wondra was appointed as administrator, treasurer and deputy clerk, and he took over plaintiff's previous duties involving accounts payable and payroll.

In May 2011, Joan Sederlund was hired as a part-time general office worker to answer phones and assist plaintiff.  Sederlund also took over primary responsibility for water and sewer billings, with plaintiff serving as back-up. Sederlund did not receive a written job description.

C.  Plaintiff's Family and Medical Leave

4

Beginning in late 2012, plaintiff took maternity leave after the birth of her child, who was born with Down Syndrome. Plaintiff returned to work January 20, 2013, but continued to be absent a great deal throughout 2013 because of her son's medical needs. During 2013, 2014, and into 2015, the Village of Frederic was helpful and supportive of plaintiff's need for extensive leave. The village board paid for plaintiff to receive assistance from a vocational expert and permitted plaintiff to work remotely from her home from June 2014 through approximately September or October 2014.

While plaintiff was on leave, Sederlund worked more than 30 hours a week to assist in the office and Administrator Wondra began handling some of plaintiff's duties. Plaintiff told Wondra he could sign her name to checks issued on behalf of the village if she was unable to do so. (Plaintiff says she gave him permission to do so only when she was unavailable because of health problems, during the time period December 2012 through January 2013, but that he continued to sign her name even when she could have done so herself. Wondra apparently does not remember plaintiff's ever placing limits on his signing her name.)

### D. Plaintiff and Sederlund Raise Concerns about Wondra in 2014

In July or August of 2014, plaintiff and Joan Sederlund discovered what they believed were documents showing that Administrator Wondra had continued to sign plaintiff's name without her permission and engaged in other misconduct. Plaintiff contacted defendant Johnson, the village board president at the time, about her concerns. According to plaintiff,

she and Sederlund met with Johnson and showed him a manilla folder containing bank statements and a water rate application confirming that Wondra had been signing plaintiff's name to checks and other documents despite her having returned to work. (Johnson does not recall that plaintiff showed him any documents.) Plaintiff also told Johnson that Wondra had changed a resolution and minutes that had already been approved by the board and had given unauthorized wage increases to public works employees. Finally, plaintiff told Johnson that Wondra had "charged off" or forgiven the water bill for the golf course. At the conclusion of the meeting, Johnson stated he would "check into things" and confirm what Wondra's role and responsibilities should be. (According to Johnson, he had a discussion with Wondra about the concerns raised by plaintiff and Sederlund, but Wondra does not recall having any discussion with Johnson.) Johnson never followed up with plaintiff or Sederlund regarding his discussion with Wondra.

During the summer of 2014, plaintiff also had discussions with Ken Hackett, the supervisor of public works, and Dale Johnson, the chief of police, about Wondra's signing plaintiff's name on checks without her permission, writing off the water bill for the golf course and changing minutes and a resolution without permission of the board. Sometime during the summer of 2014, plaintiff reported to accountants and auditors at the village's accounting firm, Clifton Larson Allen, that Wondra had made unauthorized wage increases to village employees. (Plaintiff says that in October 2014, she told defendant Worthington, a member of the village board, about Wondra's actions, including his signing her name to checks and loan documents, writing off utility bills and giving unauthorized wage increases

6

to public works employees.  Worthington denies having any conversation with plaintiff about Wondra's engaging in improper conduct.)

On December 2, 2014, Joan Sederlund contacted the Polk County Sheriff's Office to report Wondra's alleged misconduct, including that he had "forged" plaintiff's name to village checks, forgiven water bills that should not have been forgiven and given public works employees a $2 per hour raise without proper authorization.  Roger Olson, the investigator assigned to the case, spoke with Sederlund and plaintiff multiple times in December 2014. Plaintiff confirmed Sederlund's report that Wondra had continued to sign her name to checks and loan documents without her permission, ordered a pay raise for workers without approval of the village board, held meetings without posting proper notifications, changed a borrowing resolution without authorization and adjusted water rates in violation of state regulation.  Plaintiff also provided Investigator Olson documents to back up her complaints about Wondra.  On December 16, 2014, Investigator Olson told plaintiff to send Wondra a letter by certified mail explaining to Wondra that he no longer had plaintiff's permission to use her signature in any manner, but plaintiff failed to do so.

E.  Plaintiff's November 2014 Meeting with the Personnel Committee

In November 2014, plaintiff contacted the village personnel committee to request 12 weeks of medical leave.  On November 19, 2014, defendants Worthington and Ammend, who served on the personnel committee, met with plaintiff to discuss plaintiff's upcoming leave and her eventual return to work following the leave.  Plaintiff told Worthington and

Ammend that she was unsure whether she would be returning to work. Worthington and Ammend asked plaintiff to resign her position so that the village could replace her with someone permanent, rather than hire a temporary worker. The following day, plaintiff sent an email to defendants Ammend and Worthington, stating,

> I'm sorry but my intentions of meeting with you last night was not to give two weeks notice but instead notify you of my leave. As we have done in the past, I feel the proper thing to do would be to fill my position on a temporary basis with the opportunity of it becoming permanent.

Dkt. #60-3 at 1. Plaintiff also sent an email to defendant Johnson, stating that she had been asked to resign by Ammend and Worthington and had refused to do so because she was entitled to take medical leave. Id. at 4.

After the conversation with plaintiff, defendant Ammend began to rethink the office structure to accommodate the possibility that plaintiff would not return to work. Ammend thought the general office position held by Joan Sederlund should be eliminated and a more qualified employee should be hired to take on the general office and village clerk duties, in the event plaintiff did not return to work. On November 20, 2014, Ammend sent an email to a human resources consultant regarding her idea of eliminating Sederlund's position and hiring someone full-time to handle plaintiff's responsibilities as well. Id. at 3.

F. Village Board Hires Jennifer Phernertton as Treasurer, Dave Wondra Resigns and Joan Sederlund's Position is Eliminated

In February 2015, while plaintiff was still on leave, the Village Board hired Jennifer Phernertton as the village treasurer. She began working on March 9, 2015, and worked

directly with Wondra. After plaintiff learned of Phernertton's hiring, she met with the personnel committee, including defendants Ammend, Worthington and Johnson, regarding her own plan to return to work. She asked whether she could return on a part-time basis, approximately 30 hours a week, but her request was denied. When plaintiff returned to work, she received a new written job description for the positions of clerk and deputy treasurer and administrative assistant.

Also in March 2015, Administrator Wondra told the village board he was resigning. He officially resigned on April 13, 2015. Several board members were surprised by his resignation.

Around the same time, the village board determined that there was no need for Sederlund's general office position and terminated Sederlund on April 13, 2015, without providing any prior notice to her or to Wondra or plaintiff. After Sederlund's position was eliminated, Phernetton was named office manager, in addition to being treasurer. Board members provided various reasons as to why Sederlund's position was eliminated. Several members testified at their depositions that the general office position was unnecessary in light of Phernertton's being hired and plaintiff's plan to return to work. Defendants Ammend and Worthington also testified that they had performance-related concerns, including that Sederlund did not have the skills she needed to provide adequate assistance in the office.

After learning of Sederlund's termination, plaintiff sent an email to defendants Johnson, Meyer, Worthington, Ammend and Harlander and to Jennifer Phernetton,

expressing her disappointment with the board's decision. She also stated in the email that,

> With the resignation of the administrator, I will be disclosing information to the new board regarding the findings of our audits and our former administrator that was turned over to the DA's office months ago and is currently still under investigation. Why do you think the 2013 audit took so long? Why do you think the water rate study is not complete yet or why the Public Service Commission felt the need to perform an on site audit? It is unfortunate that instead of seeking the truth and the facts you chose to be misled by this single individual who ran out the door disposing of village records in the shop dumpster. . . .

Dkt. #60-4 at 2.

The next day, defendant Johnson contacted the Laux Law Firm, the attorneys for the Village of Frederic, regarding whether a complaint had been filed with the district attorney regarding Administrator Wondra.

### G. Public Service Commission Audit

Meanwhile, in March 2015, auditors from the Wisconsin Public Service Commission conducted an audit of the Village of Frederic's water utility. Plaintiff provided information to the commission about Wondra's failure to bill the local golf course and country club for water usage. The commission issued its final order on the audit on February 25, 2016, concluding that the water utility had failed to properly bill the country club on several occasions. Additionally, the commission found that the utility's record of retention practices violated state law.

After the local newspaper reported on the commission's audit, defendant Meyer came to see plaintiff in her office. (Plaintiff says Meyer told plaintiff she was lying about Wondra and that the investigation would prove Wondra's innocence. Meyer denies ever calling

plaintiff a liar or stating that Wondra was "innocent.")

## H. April 2015 Election

In April 2015, the Village of Frederic held an election in which a number of items were on the ballot, including the village board position held by defendant Ammend, a judgeship and a referendum. At the end of the election night, Prudence Lahti and two other election officials discovered that several ballots were missing either one or both election inspector signatures. The election officials attempted to research online whether they should count the ballots, but were unable to find an answer. The officials voted among themselves not to count those votes. They placed all the ballots in a bag and sealed it.

When plaintiff heard about the uncounted ballots, she contacted county election officials for guidance. A county official recommended that plaintiff review the uncounted ballots. Plaintiff called Lahti and Sederlund to conduct a canvas of the ballots. Lahti felt uneasy about opening the sealed ballot bag, but plaintiff and Sederlund decided they should review and count the rejected ballots. The rejected ballots did not change the outcome of the results. Later, Lahti told defendant Ammend about what had occurred, and Ammend encouraged her to report her concerns to the Government Accountability Board.

After all of the ballots had been tallied, the incoming village board president was defendant Meyer. Defendant Hansford had also been elected to the board. Defendants Johnson and Worthington were not re-elected. (According to plaintiff, she met with Meyer in April 2015, shortly after he was elected, for about an hour to show him the manila folder

containing documents illustrating former administrator Wondra's misconduct. Plaintiff told Meyer that the information had been turned over to the Polk County investigator and that the Public Service Commission was conducting an audit. Meyer has no recollection of such a meeting.) Plaintiff also met with defendant Hansford shortly after he was elected to the board and showed him the manila folder at Joan Sederlund's home. They discussed the golf course, the alleged forgery and an allegation that Wondra had written off other residents' water bills.

## I. Government Accountability Board Investigation

After the election, Prudence Lahti, Carey Lillehaug (another election volunteer) and defendant Johnson all filed complaints with the Governmental Accountability Board regarding plaintiff's handling of the election and in particular, the decision to open the ballot bag that Lahti and Lillehaug had decided to seal.

In June 2015, plaintiff returned to work full time. (She had been working only part-time since her return from family and medical leave in the spring.) That same month, June 2015, defendant Ammend went to the village attorney, Timothy Laux, to seek his counsel regarding plaintiff. Ammend showed Laux copies of the complaints that had been filed by defendant Johnson, Lahti and Lillehaug with the Government Accountability Board. Laux advised Ammend that the board should place plaintiff on paid administrative leave pending the outcome of any investigation by the Government Accountability Board. On June 22, 2015, the board voted unanimously to place plaintiff on paid administrative leave, effective

June 23, 2015, pending the outcome of the Government Accountability Board investigation. The minutes from the meeting stated that plaintiff was being placed on leave because of the investigation "in order to respect the reputation of the village clerk and to remove the board from any actual or perceived conflict of interest while the investigation runs its course."

The Government Accountability Board issued a report on the investigation on August 24, 2015. The report stated that plaintiff had not abused her discretion in deciding to open the sealed ballot bag and count the ballots that did not have two sets of election inspector initials, because she had determined that the number of voters on the poll books matched the total number of voted ballots. However, the report stated that plaintiff had violated state regulations by failing to publish a sample ballot in the local newspaper prior to the election, even though she had posted balllots around the village. Finally, the report noted that there was a factual dispute as to whether all the previously-rejected ballots were counted, or whether they were counted only for certain offices or contests. The report stated that it would have been an abuse of discretion if plaintiff had not treated all ballots the same.

### J. Jennifer Phernetton Prepares Memo Complaining about Plaintiff

Village Attorney Laux told the board that he did not think the Government Accountability Board's report found a level of fault that would require plaintiff to stay on administrative leave or preclude her from returning to work. Laux's opinion prompted Phernetton, the office manager and treasurer, to prepare a document titled "Kristi Swanson – Job Performance," which she distributed at a board meeting to all of the board members.

According to Phernetton, the village office had been in a disarray since she began her employment there in March 2015, and Phernetton attributed many of the problems to plaintiff. In particular, Phernetton reported that plaintiff was responsible for the village's being behind on certain accounting functions and paperwork, failing to collect nearly $12,000 in taxes and receiving complaints regarding liquor license applications not being mailed out. Phernetton also believed plaintiff to be unhelpful, difficult to work with and irresponsible with her time, in that she missed work frequently and took excessive breaks. (Plaintiff denies that Phernetton's perceptions were accurate or that plaintiff was to blame for the problems Phernetton identified.) Phernetton included many of these complaints in the document she distributed to Board members. The document also included a section titled "Harassment, Slander, Dishonesty and Vindictive Behavior," which stated:

> Kristi became angry with Mr. Wondra and decided to do her own investigation on him and turn over village documents to the Polk County District Attorney without even asking or sharing information with any Village Board Members.

> I caught Kristi several times being dishonest, most notably when I asked her how she went about starting an investigation against Wondra. She told me the village auditors showed her the proper steps to take to turn over information with the District Attorney. I spoke with both our auditors and neither of them knew anything about this.

> Phernetton told village board members that she would resign if plaintiff was not terminated. After receiving Phernetton's memo, defendant President Meyer called the village board to a closed session on November 2, 2015. Defendants Hansford, Siebenthal, Ammend, Gustafson, Meyer and Greg Heine (who is not named as a defendant) attended the meeting. Village Attorney Laux was also present. Laux advised the board that the list

14

of deficiencies provided by Phernetton constituted sufficient reasons to terminate plaintiff's employment. The Board members present then voted unanimously to terminate plaintiff's employment.

Before she was terminated, plaintiff was not asked to review or respond to any of the accusations Phernetton had made against her. Phernetton's memo was also the first plaintiff had heard of any employees raising concerns about her performance. In particular, from the time she began employment with the Village of Frederic in 2004 through the beginning of April 2015, no elected officials or employees of the village, including Administrator Wondra, had told plaintiff that they had concerns about her performance, conduct or attitude as a village employee.

The individual defendants later identified various reasons for their vote to terminate plaintiff's employment: Gustafson said he voted to terminate plaintiff after reviewing the document prepared by Phernetton; Siebenthal voted to terminate plaintiff because she was not able to work in the office; Ammend voted to terminate plaintiff because she had "lost trust" in plaintiff; Hansford voted to terminate plaintiff because she was not completing her job tasks and for other reasons included in Phernetton's memo; and Meyer voted to terminate plaintiff because of "mass confusion" in the office and things not being done.

OPINION

Plaintiff contends that the village board terminated her employment in retaliation for her reporting the corrupt and illegal activities of Administrator Dave Wondra to members

of the village board, the Public Service Commission, the village's accounting firm and the Polk County Sheriff's office. Her theory is that the village board was upset that plaintiff discussed village business with outside authorities, rather than attempting to resolve her concerns internally, and the board was frustrated that her reports of Wondra's conduct led to an extensive audit by the Public Service Commission and a criminal investigation by the county. (Plaintiff initially also contended that defendants Johnson, Worthington and Ammend retaliated against her by asking her to resign in November 2014, but she has withdrawn that claim. Plt.'s Br., dkt. #62, at 13.)

To succeed on her First Amendment retaliation claim, plaintiff must show that: (1) her speech was constitutionally protected; (2) this speech was a cause of her employer's action; and (3) she suffered deprivation as a result. <u>Wackett v. City of Beaver Dam, Wisconsin</u>, 642 F.3d 578, 581 (7th Cir. 2011) (citation omitted). Defendants concede that plaintiff's termination was an adverse employment action. However, they contend that plaintiff cannot succeed on her retaliatory termination claim because (1) her speech was not protected by the First Amendment; and (2) she cannot establish a causal connection between her speech and her termination. I address each of defendants' arguments below.

## A. The Nature of Plaintiff's Speech

To show that the speech she made while publicly employed was protected under the First Amendment, plaintiff must demonstrate that "(1) [s]he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) h[er] interest in

expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.'" <u>Swetlik v. Crawford</u>, 738 F.3d 818, 825 (7th Cir. 2013) (quoting <u>Houskins v. Sheahan</u>, 549 F.3d 480, 490 (7th Cir. 2008)). Defendants challenge only plaintiff's ability to satisfy the first step of this analysis.

Whether an employee speaks as an employee or a citizen depends on whether the speech was made "pursuant to [her] official duties." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421 (2006). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Kubiak v. City of Chicago</u>, 810 F.3d 476, 481 (7th Cir. 2016). However, speech does not lose protection simply because it "concerns" or is "acquired by virtue of [the citizen's] public employment." <u>Lane v. Franks</u>, — U.S. —, 134 S. Ct. 2369, 2379 (2014). <u>See also</u> <u>Chrzanowski v. Bianchi</u>, 725 F.3d 734, 738 (7th Cir. 2013) ("Public employee speech does not lose First Amendment protection because it concerns the subject matter of the employee's job."). Courts "must be especially careful in concluding that employees have spoken pursuant to their official duties when the speech concerns allegations of public corruption." <u>Kristofek v. Village of Orland Hills</u>, 832 F.3d 785, 793 (7th Cir. 2016). As the Supreme Court has explained,

> [i]t would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim. Such a rule would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs.

<u>Lane</u>, 134 S. Ct. at 2380. <u>See also</u> <u>Waters v. Churchill</u>, 511 U.S. 661, 674 (1994) (plurality

opinion) ("Government employees are often in the best position to know what ails the agencies for which they work.").

Speech is not protected by the First Amendment if it "ordinarily [falls] within the scope of the [plaintiff]'s duties." Lane, 134 S. Ct. at 2379. Thus, in Garcetti, 547 U.S. at 422, 424, the employee was a deputy district attorney who wrote an internal memorandum for his supervisors recommending dismissal of a particular prosecution. The plaintiff's speech was not protected because he was performing work for which he was "commissioned" and "paid to perform." Id. In contrast, the employee in Lane, 134 S. Ct. at 2383, was a former director at a community college who had testified in court regarding corruption in the program he managed. The Court held that his speech was protected speech because "his [ordinary] responsibilities did not include testifying in court proceedings." Id.

The inquiry regarding whether speech falls within the scope of an employee's official duties is a "practical one" that goes beyond a written job description. Garcetti, 547 U.S. at 422-24. The employee's official duties include both formal job requirements and "the employer's real rules and expectations." Fairley v. Andrews, 578 F.3d 518, 523 (7th Cir. 2009). See also Davis v. City of Chicago, 889 F.3d 842, 845 (7th Cir. 2018). The determination of whether speech is constitutionally protected is a question of law. Kubiak, 810 F.3d at 481 (citing Houskins v. Sheahan, 549 F.3d 480, 489 (7th Cir. 2008)).

In this instance, defendants argue that plaintiff's speech is not protected by the First Amendment because her speech fell within the scope of her duties as clerk and deputy treasurer, the position she held at the time she reported Wondra's alleged misconduct. In

particular, defendants argue that although plaintiff's written job description did not state specifically that plaintiff was to report any misconduct by office staff, her duties required her to maintain meeting minutes, monitor the village checking account and utility billings and insure that village finances were handled correctly. Defendants argue that her reports of Wondra's forging checks and loan documents, altering meeting minutes, giving unauthorized raises and failing to collect water bills, among other things, relate directly to her job responsibilities regarding the village's finances.

It may be that plaintiff's inherent job duties required her to report certain financial misconduct that directly affected her ability to perform her own job, such as her belief that Wondra was forging her name on checks and other documents. At most, however, plaintiff would be required to report such misconduct to the village board, as the board hired plaintiff and Wondra and had the authority to terminate either of their positions. Thus, there is a plausible argument that plaintiff's report of Wondra's conduct to board members, including defendants Johnson and Worthington, was part of her official job duties and thus, not protected by the First Amendment.

However, plaintiff's reports to board members is not the only speech at issue. When Johnson or Worthington failed to take any obvious steps to address Wondra's actions, plaintiff and Sederlund decided to contact law enforcement. Plaintiff's speech to the Polk County investigator is protected by the First Amendment, as her official job duties did not include reporting her coworkers to law enforcement or providing village documents to outside agencies without direction from a supervisor or the village board. Plaintiff's contacts

with the county investigator occurred on her own time and outside of the office. Additionally, despite defendants' arguments to the contrary, many of plaintiff's allegations regarding Wondra do not obviously concern plaintiff's own job duties, such as her allegations that Wondra changed a board resolution, reduced the water bill for the local golf course or gave pay raises to other employees without permission. Defendants have submitted no evidence suggesting that plaintiff was responsible for reviewing resolutions, insuring pay raises were authorized or reviewing water bills issued by other office staff. Defendants also do not submit evidence showing that Wondra's actions affected plaintiff's ability to perform the duties for which she was responsible. Nor do plaintiff's own reports suggest she believed Wondra's actions were making it difficult for her to do her job. Instead, plaintiff reported the perceived misconduct because she believed Wondra was overstepping his authority.

Defendants suggest that an employee who handles public finances must report financial misconduct or similar corruption to outside agencies. Dfts.' Reply Br., dkt. #69, at 11. However, they cite no legal authority to support this argument. Instead, the weight of authority states that a public employee's report of misconduct to an outside agency, outside the chain of command, is usually protected by the First Amendment. Compare Kristofek, 832 F.3d at 793 (part-time police officer's report of possible misconduct to FBI regarding arrestee's voided citation was protected); Chrzanowski, 725 F.3d at 739–40 (county prosecutor's testimony to grand jury and at trial regarding alleged wrongdoing by his supervisors was protected); Chaklos v. Stevens, 560 F.3d 705, 709–12 (7th Cir. 2009) (employee's complaint regarding contract was protected because employee made complaint

to state police, and not to attorney general or chief procurement officer as required by code); with Kubiak, 810 F.3d at 481 (police officer's report of harassment by coworker to supervisors and office of internal affairs not protected because she reported misconduct in manner dictated by official policy); Bivens v. Trent, 591 F.3d 555, 560 (7th Cir. 2010) (officer's reports up the chain of command to his supervisors regarding safety issues at firing range for which he was responsible not protected) and Fairley v. Andrews, 578 F.3d 518, 522 (7th Cir. 2009) (Cook County jail guards' internal complaints not protected). See also Dahlia v. Rodriguez, 735 F.3d 1060, 1074 (9th Cir. 2013) ("When a public employee communicates with individuals or entities outside his chain of command, it is unlikely that he is speaking pursuant to his official duties.").

In this case, plaintiff's speech to the Polk County investigator falls within the category of reporting misconduct outside established channels and in an area for which she did not have formal responsibilities. Prompted by defendants Johnson and Worthington's dismissal of her concerns, plaintiff and Sederlund reported Wondra's activities to the district attorney, on their own initiative, while off-duty and on their own time. Therefore, plaintiff's speech to law enforcement was the constitutionally protected speech of a private citizen. As discussed below, because plaintiff has submitted evidence showing that defendants were aware of her speech to the county investigator, I need not consider whether all of plaintiff's reports to other individuals and agencies regarding Wondra's misconduct constituted protected speech.

B.  Causation

In addition to showing that her speech was constitutionally protected, plaintiff must adduce evidence that would allow a reasonable jury to find that her "protected conduct was a motivating factor" in defendants' decision to terminate her employment.  Peele v. Burch, 722 F.3d 956, 959–60 (7th Cir. 2013) (internal quotation marks omitted).  After the plaintiff makes that showing, "the burden shifts to the defendant to show that the harm would have occurred anyway."  Milliman v. Cty. of McHenry, 893 F.3d 422, 430–31 (7th Cir. 2018) (citations omitted).  "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus."  Id. (citations omitted).  "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie."  Id.  See also Zellner v. Herrick, 639 F.3d 371, 379 (7th Cir. 2011); Bisluk v. Hamer, 800 F.3d 928, 933–34 (7th Cir. 2015).  Ordinarily, "the persuasiveness of an employer's non-retaliatory explanation . . . is 'for the finder of fact to assess.'"  Milliman, 893 F.3d at 431 (quoting Massey v. Johnson, 457 F.3d 711, 719 (7th Cir. 2006)).  However, "summary judgment should be granted when, in light of the defendant's unrebutted evidence, 'the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point.'"  Id. (citation omitted).

As an initial matter, I conclude that plaintiff has not shown that any retaliatory

animus held by defendants Johnson, Worthington or Boyer was a cause of her termination. Both Johnson and Worthington had been off the board nearly seven months by the time plaintiff was terminated. Neither was involved in the closed meeting at which plaintiff was terminated, and plaintiff has not shown that either influenced the other defendants' decision to terminate plaintiff. As for defendant Boyer, plaintiff has included no proposed facts of any kind relating to him, and it is undisputed that he was not involved in the vote to terminate her employment. Therefore, plaintiff's retaliation claims against Johnson, Worthington and Boyer fail. Nichols v. Michigan City Plant Planning Dept., 755 F.3d 594, 604 (7th Cir. 2014) (affirming summary judgment for defendants where biased employee did not cause termination); Johnson v. Koppers, Inc., 726 F.3d 910, 915 (7th Cir. 2013) (same).

With respect to the remaining defendants, there are genuine disputes of material fact regarding whether plaintiff's protected speech was a motivating factor in defendants' decision to terminate her. It is undisputed that each defendant received and reviewed a copy of Jennifer Phernetton's memo identifying various deficiencies in plaintiff's performance and attitude. Phernetton's memo included the statement that plaintiff had "decided to do her own investigation on [Wondra] and turn over village documents to the Polk County District Attorney without even asking or sharing information with any Village Board Members." The document likewise accused plaintiff of dishonesty regarding her complaints against Wondra. Additionally, if plaintiff's version of events is accepted as true, she told both defendants Meyer and Hansford directly that she had reported Wondra to law enforcement.

Additionally, she sent an email to Meyer, Ammend and Harlander in April 2015 regarding Wondra's misconduct. Thus, plaintiff has submitted sufficient evidence from which a jury could conclude that the board members were informed about plaintiff's protected speech.

Additionally, plaintiff has submitted evidence suggesting that her speech against Wondra was a motivating factor in defendants' decision to terminate her. Defendants concede that they relied on the allegations in Phernetton's memo when voting to terminate plaintiff. With respect to defendants Meyer and Hansford in particular, a jury could conclude that both were frustrated by plaintiff's reports regarding Wondra. According to plaintiff, President Meyer reacted angrily to plaintiff's complaints about Wondra, accused plaintiff of lying and stated that Wondra would be exonerated. As for Hansford, he testified at his deposition that he was concerned about gossip and he wondered whether the reports regarding Wondra and the golf course were "gossip," as opposed to actual "facts." Hansford Dep., dkt. #53, at 33.

Defendants respond that they were motivated to terminate plaintiff based on Phernetton's complaints about plaintiff and their own perceptions about plaintiff's performance and attitude, but not Phernetton's statements about plaintiff's investigation of Wondra. Certainly, a jury could reasonably believe that defendants terminated plaintiff for non-retaliatory reasons, such as believing she had a poor attitude, failed to come to work on time and made numerous mistakes at work. Even if defendants' reliance on Phernetton's memo was misplaced or unfair, defendants cannot be liable for retaliation if they fired plaintiff for a non-retaliatory reason. Milliman, 893 F.3d at 431 ("An employer's reasons

for firing an employee can be 'foolish or trivial or even baseless,' as long as they are 'honestly believed.'") (citation omitted).

On the other hand, plaintiff has submitted evidence undermining the persuasiveness of defendants' explanation for her termination. Plaintiff denies Phernetton's critiques and has submitted evidence refuting many of the statements in Phernetton's memo. Additionally, it is undisputed that none of the defendants ever talked to plaintiff about the complaints contained in Phernetton's memo, despite the fact that plaintiff had worked for the village for more than a decade and had never before been warned, reprimanded or accused of failing to perform her job adequately. In particular, plaintiff's long-term coworkers, Sederlund and Wondra, never complained about plaintiff's performance. A jury could disbelieve defendants' statements that they accepted without reservation the complaints by Phernetton, who had worked for the village for only a few months. Further, defendant Siebenthal stated at his deposition that he voted to terminate plaintiff because the board needed someone who could work in the office, and plaintiff could not. Siebenthal Dep., dkt. #56, at 8. This statement makes little sense, as it is undisputed that plaintiff wanted to return to work full time in June 2015, and was not in the office only because she had been placed on administrative leave by the board. Similarly, defendant Ammend stated that she voted to terminate plaintiff based on her actions during the election, but the Government Accountability Board report stated that plaintiff acted appropriately in opening the sealed ballot bag and that plaintiff's only violation was failing to publish election ballots in the local newspaper.

In sum, there are genuine disputes of material fact regarding defendants' true reasons for terminating plaintiff. It may be that defendants did not believe plaintiff was performing her job well or that plaintiff created too much drama in the office. However, a reasonable jury could also conclude that defendants believed plaintiff's statements to the district attorney regarding perceived misconduct were improper and created unnecessary drama and that they terminated her in retaliation for her reports. Accordingly, the motion for summary judgment as to defendants Ammend, Siebenthal, Gustafson, Hansford and Harlander must be denied.

## ORDER

IT IS ORDERED that

1. Defendants' motion for summary judgment, dkt. #39, is GRANTED IN PART and DENIED IN PART. The motion is GRANTED with respect to plaintiff Kristi Swanson's claims against defendants William F. Johnson, Jamie Worthington and John Boyer, and these defendants are DISMISSED from this case. The motion is DENIED in all other respects.

2.  Defendants' motion for leave to file supplemental proposed findings of fact, dkt.

#65, is GRANTED.

Entered this 20th day of September, 2018.

BY THE COURT:

/s/
BARBARA B. CRABB
District Judge